* * * * * * * * * * *
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby REVERSES the Opinion and Award of Deputy Commissioner Phillips.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendants.
3. Federated Mutual Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage was $348.18, which yields a compensation rate of $232.12.
5. The parties entered the following into the evidence of record at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit No. 1: medical records
b. Stipulated Exhibit No. 2: I.C. Forms
c. Plaintiff's Exhibit No. 1: job description
d. Plaintiff's Exhibit No. 2: performance evaluation
e. Plaintiff's Exhibit No. 3: interrogatories
6. The issues for determination by the Commission are whether plaintiff sustained an injury by accident in the course and scope of her employment on August 4, 2001 and, if so, to what compensation is plaintiff entitled.
 * * * * * * * * * * *
Based upon all of the evidence produced at the hearing, the Full Commission makes the following:
 FINDINGS OF FACTS
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 61 years old. She has an eighth grade education but earned her GED.
2. Plaintiff's work experience was in manufacturing jobs requiring production. She worked for defendants as a plastic mold machine operator for five years. Her job required her to remove, inspect, and package custom-made plastic items from metal molds.
3. Plaintiff has a medical history of right carpal tunnel release surgery in 1993. After the surgery she was assigned a 15% permanent partial disability rating to her right hand. Plaintiff has also had high blood pressure since 1993. In 1998 she had a stroke which caused some generalized right-sided weakness.
4. On August 14, 2001, plaintiff was removing plastic parts from a metal mold. When a part stuck in the mold, plaintiff tried to forcefully remove the part from the mold. As plaintiff reached into the machine to pull the part off, her right hand flew back, she almost lost her balance, and her hand hit the metal mold. After she struck her hand, plaintiff experienced pain in her arm and neck, numbness in her arm, swelling and numbness in her hand, and tingling in her fingers.
5. Defendants accepted the claim as medical only and initially provided medical treatment to plaintiff.
6. Plaintiff continued working for the employer on August 14, 2001 and for approximately three additional weeks before seeking any medical treatment.
7. On September 8, 2001, plaintiff presented to the Emergency Department at Memorial Mission Hospital complaining of right wrist and hand pain. X-rays were taken of plaintiff's right wrist that revealed degenerative changes but no acute pathology. Plaintiff was instructed to wear a splint and referred for followup to Carolina Hand Center. Plaintiff was not written out of work.
8. On September 10, 2001, plaintiff presented to Dr. Lacy E. Thornburg of Carolina Hand Surgery Associates in Asheville. Dr. Thornburg diagnosed plaintiff with right cubital tunnel syndrome and possible left carpal tunnel syndrome, prescribed a right wrist splint, and ordered nerve conduction studies.
9. Dr. Thornburg restricted plaintiff to light duty, which the employer provided.
10. On October 8, 2001, plaintiff presented to Dr. Cecil Durham of Mountain Neurological Center in Asheville. Dr. Durham performed nerve conduction studies that revealed the possibility of mild medial nerve dysfunction at the right wrist.
11. On October 22, 2001, plaintiff returned to Dr. Thornburg. After reviewing the results of the nerve conduction studies, Dr. Thornburg noted that plaintiff's symptoms did not seem to correlate with nerve compression.
12. Dr. Thornburg further noted that plaintiff was working and wearing her wrist splint at work and recommended that she continue to wear her wrist splint as needed to work.
13. On December 19, 2001, plaintiff presented to Dr. Thornburg complaining for the first time of lateral elbow pain. Dr. Thornburg diagnosed plaintiff with right lateral epicondylitis and possible mild carpal tunnel syndrome and recommended physical therapy. Thereafter, defendants filed a Form 61 indicating that while the blow to plaintiff's right hand was accepted as compensable, further medical treatment was denied as unrelated to the trauma to plaintiff's right hand.
14. Dr. Thornburg testified that it was unlikely that the injury on August 14, 2001 caused, aggravated, accelerated, exacerbated, or contributed to the elbow problems for which he treated plaintiff. Dr. Thornburg explained that plaintiff did not complain of elbow pain until December of 2001 and that if plaintiff's elbow problem had been caused by an acute injury, he would have expected the elbow to hurt right away. Under further questioning by plaintiff's counsel, Dr. Thornburg admitted that it was possible that the type of trauma plaintiff sustained when she hit the metal mold could have caused an injury to her elbow.
15. Although plaintiff continued working, she was unable to meet production after her hand injury and neck aggravation. On March 14, 2002, plaintiff quit the employment after a confrontation with her supervisor about her productivity level. The following day she returned to the employer to explain that she was working in pain and had delayed having surgery while trying to work the best that she was able. Plaintiff asked the owner of the employer to re-hire her but he told her that he did not hire workers who quit.
16. On March 18, 2002, after having quit the employment, plaintiff returned to Dr. Thornburg complaining of lateral elbow pain. Dr. Thornburg decided to proceed with a right lateral epicondyle debridement and radial tunnel release. On March 28, 2002, plaintiff underwent the recommended surgery.
17. From March 28, 2002 through May 7, 2002, plaintiff was restricted to left-handed work using the right hand only as an assist. On May 8, 2002, plaintiff was released to return to work at light duty for a period of three weeks. Thereafter, in June 2002 plaintiff was released to return to work at full duty.
18. On August 12, 2002, Dr. Thornburg released plaintiff to return to work with no restrictions.
19. When plaintiff returned to Dr. Thornburg on November 4, 2002, Dr. Thornburg noted that although plaintiff was not working outside the home, she was caring for her grandchildren.
20. On February 26, 2003, plaintiff presented to Dr. Thornburg with complaints of neck and posterior shoulder pain down to her elbow in her right upper extremity. Dr. Thornburg's office visit notes do not document any prior complaint of neck and shoulder pain. Dr. Thornbrug did not recommend any further surgical treatment and suggested that plaintiff follow-up with her primary care physician.
21. On April 14, 2003, plaintiff was evaluated by Dr. Stephen K. Westly, a board-certified orthopedist in Asheville whose specialty is hand surgery. In his report, Dr. Westly noted four causes of plaintiff's current upper extremity complaints: (1) cervical spondylosis with radiculopathy; (2) probable mild residual paresis secondary to the stroke she suffered in 1998; (3) possible slight residual or recurrent dysfunction of the median nerve across the right carpal canal; and (4) possible mild dysfunction of the posterior interosseous nerve in the right forearm.
22. Dr. Westly felt plaintiff's injury by accident aggravated the pre-existing cervical condition, as well as the pain and dysfunction in her right arm. In view of the significant sensory abnormalities and motor weakness, Dr. Westly felt plaintiff had an overall impairment in the right upper extremity in the range of 65-85% and was not capable of performing any significant productive work with the right upper extremity.
23. Dr. Westly agreed that no further surgical treatment to the right upper extremity was warranted, but left open the possibility that cervical spine surgery might be indicated and recommended that plaintiff be referred to a spine specialist for further evaluation.
24. Dr. Westly felt that plaintiff's overall condition and her significant symptomatology and apparent abnormalities on physical examination were due to multiple factors, many of them potentially fairly severe. One of these factors was plaintiff's injury on August 14, 2001.
25. Dr. Thomas Gaffney, a physician who is a clinical volunteer with the Buncombe County Health Department and who has treated plaintiff, noted a number of medical conditions from which plaintiff suffered including, but not limited to, hypertension, angina, a prior stroke, and what he characterized as continuing tobacco abuse. Plaintiff first complained of neck pain at the visit to Dr. Gaffney on December 18, 2002.
26. When plaintiff continued to complain of neck pain to Dr. Gaffney on March 10, 2003, Dr. Gaffney ordered an MRI examination of plaintiff's cervical spine and right shoulder that was performed on March 11, 2003. The MRI showed plaintiff had rotator cuff tendonopathy, bursitis, degenerative cysts of the humerus and acromioclavicular osteoarthritis. Dr. Gaffney believed plaintiff needed an evaluation by an orthopedist, but defendants refused to pay for this treatment. Dr. Gaffney felt that plaintiff was unable to work because of the discomfort and disability in her shoulder.
27. Dr. Gaffney felt that it was possible that the abrupt motion when plaintiff hit the back of her hand aggravated or accelerated the problems shown on the MRI. At his deposition he stated that "any hyperextension or injury to the arm or the shoulder could conceivably aggravate . . . any one or all of those conditions."
28. Vocational rehabilitation expert Randy Adams evaluated plaintiff and found after testing that she had an eighth grade reading level, fourth grade spelling level, and sixth grade math skills. Based upon the various tests he administered, Mr. Adams expressed his vocational opinion that plaintiff was not capable of obtaining or maintaining any substantial gainful employment.
29. The Full Commission gives greater weight to the expert medical opinions of Dr. Westly and Dr. Gaffney than to the opinions of Dr. Thornburg.
30. The Full Commission finds based upon the greater weight of the credible evidence that the injury by accident on August 14, 2001, aggravated plaintiff's pre-existing elbow, neck and shoulder conditions.
31. As of the Deputy Commissioner hearing, plaintiff had not returned to work for another employer and had filed a disability claim under the Social Security Act.
32. As the result of the compensable injury by accident which aggravated her underlying conditions, plaintiff was disabled from any employment as of the surgery on March 28, 2002 until released to return to work with no restrictions on August 12, 2002. The evidence of record does not show that any doctor removed plaintiff from work or that plaintiff made reasonable efforts to find employment from August 12, 2002 until December 18, 2002 when plaintiff was treated by Dr. Gaffney for her neck and shoulder conditions. Since December 18, 2002 plaintiff has continued to be unable to earn wages in any employment due to her compensable injury by accident.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 14, 2001, plaintiff sustained an injury by accident while in the course and scope of her employment with defendants, which resulted in injury to her right hand, right arm and shoulder, and neck. N.C. Gen. Stat. § 92-2 (6).
2. On March 14, 2002, plaintiff quit her job which constituted a constructive refusal of suitable employment. Therefore, plaintiff is not entitled to any compensation from that date until her surgery on March 28, 2002. N.C. Gen. Stat. § 97-32.
3. As a result of the compensable injury by accident, plaintiff was temporarily totally disabled and entitled to temporary total disability compensation at the rate of $232.12 per week from March 28, 2002 through August 12, 2002 and from December 18, 2002 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to receive medical treatment for her injury by accident which has been necessary to effect a cure, lessen her period of disability, or relieve her pain. N.C. Gen. Stat. §§ 97-25, 97-25.1.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay plaintiff temporary total disability compensation at the rate of $232.12 per week from March 28, 2002 through August 12, 2002 and from December 12, 2002 and continuing until further Order of the Commission. Any amount which has accrued shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff is hereby approved for plaintiff's counsel. Past due amounts shall be deducted from the sums due plaintiff and paid directly to plaintiff's counsel; thereafter, every fourth compensation check shall be paid by defendants directly to plaintiff's counsel.
4. Defendants shall bear the costs.
This the 21st day of February 2005.
 S/ __________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/ _____________________ CHRISTOPHER SCOTT COMMISSIONER
 S/ _____________________ PAMELA T. YOUNG COMMISSIONER